**Wheeling.**

BRADFORD et al. v. McCONIHAY et al.

Decided November 22, 1879.

1879
Special Term.

1. W. owned a salt property within a quarter of a mile 'of Browns-town, on the western side of the Kanawha river, and the coal and timber on three hundred and twelve acres of land distant four miles, in the forks of Lens creek which empties into the Kanawha river on the same side of it and a half mile ·above Brownstown, which had been conveyed to him by M. He also owned other lands on each side · of Lens creek, which had been conveyed to him by H. By his will W. provides :. "I direct my executors that they shall sell the land conveyed to me by M., and they shall also sell my interest in the back lands below the left hand fork of Lens creek, conveyed to me by H. In making the sale my executors shall act as they deem best, as to the proper time when said property shall be sold, and they are authorized, if they think best, to give credits from one to five years in making the sale. When the legacy, hereinafter pro-vided to be paid out of the proceeds of this land, is paid, I give the residue of the fund to my four children," In a subsequent clause the will reads : "I give unto my friend B. $3,000.00, to be paid out of the proceeds arising from the sale of said land." It being doubt-ful whether the words "below the left hand fork of Lens creek," used in describing the lands to 'be sold, meant lands lying on the the lower side of Lens creek, or lands lying nearer the mouth of this creek than the mouth of the left hand fork, or what lands were to be sold, the executor brought a suit to ascertain what lands were to be sold. Taking in connection with other parts of the will the court construed it by a decree which reads : "The court doth decide that the executor of W. is empowered by said will to sell the land con-veyed to W. by M. and also all the lands conveyed to him by H. be-low Lens creek." HELD :

That by this will, as interpreted by this decree, the executor could sell all the lands conveyed to the testator by M. wherever situ-

ated, and all the lands conveyed to him lying on the lower or northern side of Lens creek and the left hand fork thereof; and that this obvious meaning of the decree cannot be changed by any admissions or statements of the manner in which this will was to be interpreted made in the pleadings in the cause.

1879
Special Term.

Bardford *et al.*
v.
McConihay *et al.*

2. After this decree appraisers were appointed, by an order of the county court to value the lands directed to be sold; and the executor had only the salt property near Brownstown appraised; and it was reported by these appraisers as the land authorized to be sold, no mention being made in their report of the coal and timber on the three hundred and twelve acre tract four miles distant. C. H. was one of the appraisers. He was afterwards appointed adminstrator *de bonis non* with the will annexed of W.; and as such he advertised for sale the salt and coal property near Brownstown, directed by W.'s will to be sold, and stated in the advertisement that there was sufficient coal on it to operate a furnace. At the time of the sale the coal and timber on the tract of three hundred and twelve acres was not spoken of, and the coal or timber on this tract had never been used in connection with this salt property. HELD:

That the coal and timber on this three hundred and twelve acres of land did not pass by this sale.

3. There being no evidence tending to impeach the fairness of the sale, it cannot be set aside for inadequacy of price, unless it be so inadequate as to justify the presumption of fraud and collusion, and to justify such presumption from this inadequacy alone, it must be so strong and manifest an inadequacy as to shock the conscience and confound the judgment of any man of common sense. Half the estimated value of such property is not such an inadequacy.

4. The legacy to B. is a demonstrative legacy; and no future time being fixed by the will for its payment, it bears interest from one year after the testator's death, and not from the time when the land, out of the proceeds of which it must be paid, was actually sold, which was eleven years after the testator's death.

Appeal from a decree of the circuit court of the county of Kanawha, rendered on the 16th day of November, 1875, in a suit in chancery in said court then pending, wherein Amelia W. Bradford and others were plaintiffs, and John McConihay and others were defendants, allowed upon the petition of said plaintiffs.

Hon. Joseph Smith, judge of the seventh judicial circuit, rendered the decree appealed from.

GREEN, PRESIDENT, furnishes the following statement of the case :

On July 13, 1839, Madison Morris and wife in consideration of $7,500.00, conveyed to Luke Wilcox a tract of land by metes and bounds, on the Kanawha river in said county, containing fifty-two and one-fourth acres, also their interest in two salt wells on a parcel of land adjoining it, being one-half of one of these wells and one-fourth of the other, and the right to pipe or convey the water of these wells to said parcel of land conveyed, and to erect machinery, &c., on the parcel of land where said wells were located, and also all their interest in the back or mountain lands of Leonard Morris, deceased, which he had willed to the grantor, Madison Morris, jointly with others and which was then undivided. In a partition of said lands of Leonard Morris, deceased, made by a decree of the circuit court of Kanawha county, June 10, 1853, there was assigned to Luke Wilcox, as grantee of the interest of Madison Morris by this deed, one undivided thirteenth part of a parcel of land containing five hundred and sixteen and one-half acres, which lay on the mountain immediately in the rear of this fifty-two and one-fourth acres conveyed to Luke Wilcox by Madison Morris and wife. The thirteenth part of five hundred and sixteen and one-half is nearly forty ; and as this thirteenth part is spoken of as forty and three-fourths acres, I presume this parcel of land was found to contain a little more, or about five hundred and thirty acres. This partition also assigned to Luke Wilcox, as grantee of Madison Morris, the coal and lumber on a tract of three hundred and twelve acres which lies on what is called "the second right hand hollow above the house of John Nuby on the left hand fork of Lens creek."

The tract of fifty-two and one fourth acres, sometimes called fifty and one-fourth acres, conveyed in 1839 to Luke Wilcox by Madison Morris and wife, lies on the Kanawha river immediately adjoining a small village known as Brownstown ; and the tract of forty and three-

1879
Special Term.

Bradford *et al.*
v.
McConihay *et al.*

fourths acres, or the thirteenth part of the five hundred and sixteen and one-half acres assigned in this partition to Luke Wilcox as grantee of Madison Morris, lies immediately in the rear of this fifty and one-fourth acres and is high land having on it coal. Up the Kanawha river about a half a mile from this fifty and three-fourths acres of land or old salt works near Brownstown, Lens creek comes in on the right hand side as you go up, on the same side of the river as this fifty and one-fourth acre tract; and it comes in at right angles.

About two miles up from its mouth this creek forks. Taking the left hand fork of this creek and going up it about a mile and a half we come on the right hand side of it to the house of Nuby; and a few hundred yards above on the same side a small stream empties at right angles. On each side of this stream lies the three hundred and twelve acre tract, the coal and timber on which was in this partition assigned to Luke Wilcox as grantee of Madison Morris. So that this tract is between three and four miles from the fifty and one-fourth acre tract and salt well. And is situated on the north side of the left hand fork of Lens creek, or, on the lower side or below this left hand fork of Lens creek, if by the word below or lower side reference is made to the Kanawha river into which this creek empties. It is on the south side of the right hand fork of Lens creek, or on the upper side or above this right hand fork of Lens creek, if by the words upper side or above reference is made to t e Kanawha river. It therefore lies between the two forks of this creek.

In this partition there was assigned to James Hewitt and the heirs of Peter Grant lot number twenty-four, containing seventeen hundred acres; and lot number twenty-seven containing seven hundred and fifty acres; and to James Brown and James Hewitt lots number thirty-one and thirty-two, containing eighty-four acres, and lot number thirty-eight, containing twenty acres; but it no where in this suit appears where any of these lots are

located. To James Hewitt there was assigned seven and three-fourths acres, adjoining this salt property and tract of fifty and one-fourth acres, and five hundred and fifty acres on the left hand side of Lens creek and of the left hand fork of this creek as you go up the same. This is known as lot number twenty-two, and it lies on the south side of Lens creek and on the upper side of it, or above it, if the words upper side and above it are construed as having reference to the Kanawha river into which it empties. It lies on the south side of this creek partly above and partly below where this creek forks bordering on the left hand fork of this creek and on the creek itself before it forks about the same distance, about a mile on each. This description of the lands is taken from a small portion of the map filed with this decree of partition, but a small part of it being copied into the record in this case.

About seven weeks after this partition was made by a decree of the court Luke Wilcox made his will, on July 27, 1853, in which among other things he provides as follows: "I further devise and hereby direct my executors, that they shall sell the land and the appurtenances and improvements thereon that was conveyed to me by Madison Morris by deed duly recorded in the clerk's office of the county of Kanawha. And they shall also sell my interest (in the back lands below the left hand fork of Lens creek) in the estate of Leonard Morris, deceased, conveyed to me by James Hewitt, and of record in the clerk's office. In making the sale of the real estate hereby directed, it is my wish and desire that my said executors shall act as they shall deem most to the advantage and interest of those concerned, as to the proper time when said property shall be sold; and they are hereby authorized to sell the same on a credit of one, two, three, four and five years, with interest, if by such credit, in their opinion, the interest of those concerned would thereby be best promoted. I desire that when the legacies and bequests, as hereinafter provided, shall have

been paid and satisfied, I give and bequeath the rest and residue of the fund arising from the sale of said estate to my four children, Henry Freeman, Amelia, Lewis Cass, and John Fletcher to be equally divided among them."

He then disposes of the rest of his estate ; and his provision in favor of his daughter, Amelia, is as follows : "Secondly. I give and bequeath unto my daughter Amelia, during her natural life, and after her death to such child or children as she may leave, my interest in the land conveyed to me by James Wright by deed bearing date the 16th day of September, 1833, and recorded in the clerk's office, lying above Lens creek, also the interest conveyed to me by James Armstrong in said lands, by deed of record in the clerk's office, together with the appurtenances thereto belonging, excepting therefrom a burying ground in the field fifty feet square inclosed; also so much of my interest in the estate of Leonard Morris conveyed to me by James Hewitt, and of record in the clerk's office—all of that part of my interest, that is, in the old field, or river survey, and all my interest that is in the back land above Lens creek and the left hand fork of the same."

He then gives his fifteen negroes and other personal property. And having disposed of his property real and personal to many parties he concludes his will thus : "Eleventhly. I give and bequeath unto my friend, the Rev. John G. Bruce, and to his heirs forforever, the sum of $3,000.00 to be paid out of the fund arising from the sale of the real estate hereinbefore directed to be sold ; also my gold watch, gold chain and key. And lastly, I hereby make Samuel Hannah and Nicholas Fitzhugh, executors of this my last will and testament.

He died about a year after making this will.

Nicholas Fitzhugh alone qualified as the executor of this will; and shortly thereafter, in 1855, he instituted in the circuit court of Kanawha county a suit, in which John McConihay, who had by an assignment become interest-

ed in the subject-matter of the suit, and Amelia W. Bradford, the daughter of Luke Wilcox named in said will, and all other parties interested were made defendants. The object of this suit was to obtain a construction by the court of the above clauses of Luke Wilcox's will, and an instruction by the court of what lands the said executor was by the said will authorized to sell, and a partition of the lands to be so sold, when held in common with others. In his bill the executor states the above facts, and also files with his bill two deeds from James Hewitt to the testator Luke Wilcox, one dated, January 1, 1833, and the other September 16, 1833, they being the deeds referred to in the will. These deeds are not, however, copied in the record under our consideration, as they obviously ought to have been. The bill, however, states that he was the owner of one-half of all the interest acquired by said Hewitt in the estate of Leonard Morris, and that in the lots directed to be conveyed and actually conveyed to said Hewitt in the partition suit of the lands of Leonard Wilcox, deceased, before referred to, Luke Wilcox owned an undivided moiety; and among the other lots so conveyed, in which he owned an undivided moiety, was this lot, number twenty-two, which lay, as above explained, on the upper side or above Lens creek, and contained five hundred and fifty acres; and in this suit this land was divided, said Hewitt being a party to the suit.

These facts stated in the bill were all admitted in the answer, but the inferences drawn from them as to the true meaning of Luke Wilcox's will were very different.

The executors' construction of the will, as shown by his bill, was that Luke Wilcox's moiety of said lot number twenty-two, being five hundred and fifty acres lying on the upper side or above Lens creek, was by this will directed to be sold by the executors. The words of the will were : " They shall also sell my interest (in the back lands below the left hand fork of Lens creek) in the estate of Leonard Morris, deceased, conveyed to me by

James Hewitt." The executor, Fitzhugh, inter- 1879
Special Term.
Bradford *et al.*
v.
McConihay *et al.*
preted the words "below the left hand fork of Lens
creek" to mean the land on either side of this creek,
which lay below the mouth of the left hand fork of said
creek; and he seems to have regarded that these words
applied as much to the lands conveyed to the testator by
Madison Morris, as to those conveyed by James Hewitt
though the wording of the will would seem obviously to
confine these words to the lands conveyed by James
Hewitt. But so construing the will he reached the con-
clusion, that though the lot, number twenty-two, contain-
ing five hundred and fifty acres lies above Lens creek
and the left hand fork thereof, yet as it lies in part below
the mouth of the left hand fork of said creek, it was in-
tended to be sold; and that the three hundred and twelve
acre tract, while it lies below the left hand fork of Lens
creek, yet as it lies above the mouth of this left hand
fork, it was not intended to be ·sold, but passed to the
testator's daughter, Amelia W. Bradford, for life, re-
mainder to such child or children, as she might leave at
her death.

Mrs. Bradford on the other hand insisted that the
words in the will "and they shall also sell my interest
(in the back lands below the left hand fork of Lens creek)
in the estate of Leonard Morris, deceased, conveyed to
me by James Hewitt" meant the lands lower down the
Kanawha river than the left hand fork of Lens creek,
that is, the lands which lie on the south of, or lower side
of, the left hand fork of Lens creek looking down the
Kanawha river; and she claimed that this was the only
construction of these words which would make them con-
sistent with the words of the will in the devise to her and
her children, which says: "Also so much of my interest
in the estate of Leonard Morris, deceased, conveyed to
me by James Hewitt and of record in the clerk's office,
all that part of my interest that is in the old field or river
survey, and all my interest that is in the back land above
Lens creek and the left hand fork of the same." She

points out also the difficulty of the construction placed on the will by the executor, from the fact that lot, number twenty-two, the five hundred and fifty acre tract, lies partly above and partly below the mouth of the left hand fork of Lens creek ; and so the testator could not have meant, by below, the left hand fork of Lens creek below its mouth, but must have meant further north or down the Kanawha river from the left hand fork of this Lens creek.

She says nothing at all in her answer particularly about this tract of three hundred and twelve acres. But it does seem to me, that while she makes no distinction in words in her answer between the lands conveyed to the testator by Madison Morris and those conveyed to him by James Hewitt, yet the inference may be fairly drawn, that she did not then claim that this three hundred and twelve acres belonged to her by the will ; and such claim would have been inconsistent with her then views of how this will should be construed. She says : "The will leaves the land lying below the left hand fork (bought of Hewitt) and 'on the upper side of Lens creek to go to the respondent, Amelia, according to the words of the will. It will be seen from the will, that the description of the lands devised the defendant, Amelia, is the same with that devised to be sold (substantially) with the exception that the lands devised to Amelia are described as lying above Lens creek ; and now it would seem to follow as a matter of course, that the lands to be sold are below Lens creek. This would seem the natural and legitimate construction."

Now even if we consider that she, like the executor, made no distinction between the lands conveyed to the testator by Madison Morris and those conveyed by James Hewitt, yet as this tract of three hundred and twelve acres certainly is " below the left hand fork of Lens creek" according to her construction of the word " below," it seems an inevitable conclusion, that according to

her construction of this will this tract of three hundred and twelve acres was directed to be sold by the will.

The court by its decree adopted her construction of the will, so far as the lands which were acquired by the testator from James Hewitt; but so far as the lands were conveyed to the testator by Madison Morris, the court held that wherever situated they were directed by the will to be sold by the executor. On the 29th of November, 1856, the court rendered this decree : "Upon consideration, the court is of opinion and doth decide, that Luke Wilcox, deceased, by his last will and testament devised all his interest in the lands conveyed to him by James Hewitt and James Armstrong, lying above Lens creek, to his daughter, Amelia, now Mrs. Amelia W. Bradford, and that no part of said lands are directed to be sold by said last will and testament ; and the court is further of opinion and doth decide, that the executor of the said Luke Wilcox, deceased, is authorized and empowered by said last will and testament to sell the land, appurtenances and improvements, conveyed to said Luke Wilcox, deceased, by Madison Morris, and also all the interest that the said Wilcox had in the estate of Leonard Morris, conveyed to him by James Hewitt, below Lens creek."

If it were necessary for us in this suit to construe the will of Luke Wilcox, I should deem it necessary to bring before us the two deeds made by James Hewitt to Luke Wilcox, referred to in his will, and a copy of the report of the partition of Leonard Morris's real estate and the full map accompanying this report; but as we are not required to construe this will in this suit, it having been already conclusively construed by the circuit court in this old suit, and as this case has already been delayed by having to issue a *certiorari*, I do not deem it necessary to issue another, especially as it is sufficiently apparent in the record, as it has been sent up, that the lands acquired from James Hewitt by Luke Wilcox, the testator, lie some above and some below Lens creek. This

1879
Special Term.

Bradford et al.
v.
McConihay et al.
sufficiently appears from said will of Luke Wilcox, said decree, said bill of the executor, Nicholas Fitzhugh, and the answer thereto of Amelia W. Bradford, which expressly stated that these lands so conveyed lie both above and below Lens creek. The exact locality of these Hewitt lands is in this case unimportant; and the omitted parts of the record could only be useful to show clearly whether these lands lay on both sides of Lens creek, and this is I think sufficiently apparent from the record that is before us.

In less than a year after this decree the county court of Kanawha county appointed three commissioners to value the lands directed by the will of Luke Wilcox to be sold, who made the following report:

" The undersigned, Abel P. Sinnett, John D. Lewis and Charles Hedrick, commissioners appointed by an order of the county court of Kanawha county for the purpose of appraising the lands directed by the will of Luke Wilcox, deceased, to be sold, which order bears date on the —— day of ————, 18—, a copy of which is herewith filed marked "A," respectfully report that they have examined and viewed the said land, and the salt property and the fixtures and building thereon, and coal property directed to be sold with the same. We found the buildings and fences in bad repair and in a very dilapidated condition, very few remains of a salt furnace, and those remains of very little value. The tract of land on the river containing the salt property, which consists of two salt wells and an undivided moiety of a salt well without any valuable fixtures, contains fifty and one-quarter acres of land, all but about ten acres of which is river bottom, of medium quality, as shown by a plat herewith filed, marked " B ; " and the coal land consists of forty and three-fourths acres, lying adjoining and back of said river land; said forty and three-fourths acres being an undivided interest in a tract of five hundred and sixteen and one-half acres, as shown by the map filed with the report of A. P. Sinnett, filed the

26th May, 1856, in the cause of *N. Fitzhugh, executor of* <sub>1879</sub> Special Term. *Luke Wilcox, deceased,* v. *H. F. Wilcox and others,* in the Bradford *et al.* circuit court of Kanawha county. And we value and McConihay *et al.* appraise the whole of said property at the sum of eight thousand five hundred dollars ($8,500.00).

"All of which is respectfully submitted.

> " C. HEDIRCK,
> " JOHN D. LEWIS,
> " A. P. SINNETT."

This report was recorded. It will be observed that these commissioners, while they describe specially the other lands, do not appraise or take any notice of this tract of three hundred and twelve acres. Immediately thereafter the executor, Nicholas Fitzhugh, advertised this land for sale publicly, and in his advertisement he took no notice of this three hundred and twelve acres A part of this advertisement has been torn off by accident and cannot be produced. So much of it as can be produced now is as follows:

" The undersigned will sell at public auction, on Monday, the 16th day of November, 1857, on the premises, the salt property lately owned and occupied by Luke *Wilson,* deceased, in Kanawha county, Virginia, below Lens creek, being the same property which was formerly conveyed by Madison Morris to said Wilcox; also said Wilcox's interest in the back lands of the estate of Leonard Morris, deceased, below Lens creek, conveyed to him by James ——"

William A. Bradford, the husband of Amelia, the daughter of Luke Wilcox, was the purchaser at about $4,600.00. He did not execute his bonds for the purchase-money, probably because it was not convenient to the executor to take the bonds at the time the purchaser proposed to give them with security; and the war breaking out shortly thereafter, and the executor, Nicholas Fitzhugh, having joined the army of the Southern Confederacy, these bonds were never given. He was removed from his office because of his engaging in the so-called

rebellion; and Charles Hedrick was duly appointed administrator *de bonis non* with the will annexed of Luke Wilcox. After the war William A. Bradford proposed to the administrator to confirm this sale to him made by the executor. The administrator would not assent to it without the consent of J. McConihay, who was the assignee of the legacy of $3,000.00 given by the will to John G. Bruce. He would not consent without Bradford would pay for the property the amount of this legacy and interest, and pay it to him, which he would not do, thinking he was not entitled to interest; and then the administrator, after advertising the property for two months, sold it at public sale, and said John McConihay became the purchaser on October 3, 1865. The following is the advertisement under which it was sold :

"VALUABLE COAL OIL LANDS AND SALT PROPERTY AT
PUBLIC SALE."

" The undersigned, administrator, with the will annexed of Luke Wilcox, deceased, will offer for sale to the highest bidder on Tuesday, 3d day of October, 1865, in front of the court house of Kanawha county, that valuable salt and coal property below Lens creek and near Brownstown, directed by said Wilcox in his will to be sold. There are about forty acres of good Kanawha bottom and sufficient coal to operate a furnace, a storehouse and other buildings. This property is supposed to be good oil territory. Terms :—One-third of the purchase money in hand, the residue in two payments at twelve and eighteen months, with interest from day of sale, the purchaser to give bond with good security for the deferred payments, and the title retained as additional security."

J. McConihay afterwards told Bradford, that if he would comply with the terms of the sale by the executor, he might have the property. This was shortly after he bought the property. The administrator, Charles Hedrick, had a settlement with John McConihay, the assigneee of the Bruce legacy ; and allowing him interest from one year after the death of the testator, Luke Wil-

cox, it was found that the legacy and interest exceeded the purchase-money of this property; and crediting on the legacy, the administrator, upon the payment to him of the costs of the sale, $248.50, conveyed to him, John McConihay, with special warranty of title "the land, appurtenances and improvements thereon that was conveyed to the said Luke Wilcox by Madison Morris by deed duly recorded in the recorder's office of Kanawha county, which deed bears date the 3d day of July, 1839, to which reference may be had for a more particular description." This deed was recorded October 5, 1865, and was dated the day of the sale, October 3, 1865.

On the 23d day of September, 1870, Mrs. William A. Bradford and her three infant children instituted this suit against the said John McConihay, Charles Hedrick, administrator *de bonis non* with the will annexed of Luke Wilcox, Nicholas Fitzhugh, late executor of Luke Wilcox, and the children of Luke Wilcox. The bill sets forth the facts hereinbefore stated except the transactions between the husband, W. A. Bradford, of the complainant, Amelia B. Bradford, and the defendant, J. McConihay. The bill alleges that the lands which were sold by Charles Hedrick, the administrator of Luke Wilcox, did not embrace any interest in the three hundred and twelve acres of land, but only those lands which had been previously appraised as land of the testator, Luke Wilcox, directed by his will to be sold; that the interest in this three hundred and twelve acres was not only not sold, but that the administrator had no right to sell it, as it is claimed the will, as construed by the decree of the circuit court, did not authorize its sale, but that on the contrary it by the will belonged to the complainant, Amelia B. Bradford, for life and on her death it went to the three other complainants, her infant children; that at the time of the sale it was not mentioned nor was it included in the advertisement; that the price of the land actually sold was grossly inadequate, and that it ought for that reason to be set aside and annulled; that in the payment

1879
Special Term

Bradford *et al.*
v.
McConihay *et al.*

for said lands the administrator unjustly and illegally allowed interest on the $3,000.00 legacy to Bruce, which had been assigned to the purchaser; and it asks that the sale and deed may be set aside and annulled, and that it may be decreed that the complainants are entitled to the said three hundred and twelve acres of land; and that it may be decreed that said legacy to Bruce does not bear interest; and for general relief.

The administrator *de bonis non* of Luke Wilcox, deceased, Charles Hedrick, filed an answer to this bill. He does not deny any of the facts stated in the bill. He claims that by the decree of the circuit court, interpreting the will of Luke Wilcox, the court held that all the lands conveyed to him by Madison Morris were directed by this will to be sold, and all the lands below Lens creek which had been conveyed by James Hewitt to the testator; that he " intended to sell all the land and appurtenances with the improvements thereon conveyed by Madison Morris and wife to Wilcox. He sold the same accordingly October 3, 1865, to said John McConihay at $4,710.00." He says further: " Respondent's deed to McConihay shows what he sold and conveyed to said McConihay, which was the land, appurtenances and improvements thereon, conveyed to said Wilcox by Madison Morris." He claims that he correctly allowed interest on the $3,000.00 legacy to Bruce. He says he made every effort in his power to get a higher price for the property and failed; that he actually sold it at a higher price than the executor had previously sold it to Bradford; and that there is no property about whose value there is so much uncertainty, as that of salt and coal property in Kanawha county; and that the sale, made by him and his predecessor at public sale on easy terms and after reasonable public notice, is better evidence of its value than the fanciful valuations of witnesses. The terms on which he sold were one-third in cash and the balance in twelve and eighteen months, with interest from date.

It is to be observed, that in this answer there is no

reply to the direct charge made in the bill ; "that at the time of the sale aforesaid made by Charles Hedrick, administrator, no mention was made of the said trust of three hundred and twelve acres, nor was the same referred to in the advertisement by him." His deposition was not taken in the suit ; and his answer was not sworn to, the bill not being sworn to by the plaintiffs.

John McConihay also filed his answer. He denies none of the allegations in the bill, except he says that "Bradford abandonded his purchase not at all because of the civil war. That the price at which the property was knocked down to Wm. A. Bradford was its value at that day. He offered his bid to respondent after the day of sale. Respondent had bid $4,000.00 ; he urged respondent to take his bid. After the war, and after the respondent had purchased the land in 1865 or 1866, W. A. Bradford came to respondent's house and asked him, if he did not know the sale was a valid one at which he, Bradford, purchased the land in 1860. Respondent said he did, and if he Bradford, would then comply with the sale and pay the purchase money, he might still have the land, and he backed right down." This he proved by a witness ; and his statement of what occured after the war was corroborated by his son.

In his answer John McConihay does not deny the explicit charge in the bill, that at the time of sale, at which he purchased, no mention was made of the three hundred and twelve acre tract. All he says is : "At the time of the sale the $4,700.00 was the full value of the land and the interest in the three hundred and twelve acres, which was sold at the time, and is a part of the purchase, and was so purchased and paid for in full by respondent, leaving a large balance of interest still due respondent." He also alleges he was the assignee of the $3,000.00 of legacy given Bruce, and that interest was properly allowed upon it. He claims that he had put improvements on the property, costing him about $4,700.00 ; that this sale was acquiesced in for nearly five

years; and that the balance of interest on the legacy com-ing to him ought to be paid; that Bradford after the sale to him had sold property, castings, coalers, &c., worth more than $2,000.00 ; and the property had greatly depreciated in value.

Bradford testified that as purchaser at the sale made by the executor, Fitzhugh, he did not understand that the three hundred and twelve acres were included in the sale. On the contrary he had always understood that they belonged under the will to his wife and children.

Fitzhugh testifies that he intended to follow in this sale the construction the court had put on his power of sale. He presumes he did not attempt to sell more than he was athorized to sell ; that the property sold by him was the Brownstown property.

The defendant, John McConihay's, deposition was taken : He was present at the first sale made by the executor, Fitzhugh, and bid at the sale ; he also bought at the second sale ; but he does not testify as to what property was offered for sale at either time.

Dryden Donnally testifies, that when the partition of the lands of Leonard Morris, deceased, was made, after the commissioners had divided the land, Luke Wilcox objected, because he thought he did not get a sufficient quantity of land for his interest, and claimed the coal and timber on this three hundred and twelve acre tract about three miles up Lens creek; and he, witness, agreed to give it out of his share, because he was very anxious to sell, and had an opportunity of selling, if the decision of the commissioners' report could then be confirmed. He says he thinks that Luke Wilcox claimed this interest in the coal and timber on this three hundred and twelve acres should be assigned him on account of his purchase from Hewitt, Grant and Armstrong. But in this he was obviously mistaken, as the decree of partition says: "And by like consent of Andrew F. Donnally, it is ordered and decreed that the timber and coal on three hundred and twelve acres of lot number twenty-eight,

hereinbefore assigned to Andrew F. Donnally, be set apart and held by Luke Wilcox in severalty, as and for his own property, which he claims by purchase from Madison Morris, which coal and timber on said three hundred and twelve acres is to be laid off on the second right hand hollow above the house of John Nuby on the left hand fork of Lens creek," though the deed made by order of the court does not specify on whose interest in this land this interest in this coal and timber was conveyed and assigned to Luke Wilcox.

One witness testified, that two or three months after the sale the purchaser, J. McConihay, told him that he was then satisfied with his purchase, that he had got more coal than he expected ; it was up Lens creek that this coal was; that a lawyer had looked it up for him. He said he had bought an interest, and did not know what interest it was till it was looked up by a lawyer. He said, till this examination by the lawyer he was dissatisfied with his purchase.

There was a very large number of depositions taken with reference to the value of this property, in 1860 and in the fall of 1865. Prior to 1850 it had been what is called dead rental, that is, rented for $2,000.00 for the purpose of preventing salt being manufactured there, so as to diminish competition. Being not used, the property became more and more dilapidated. In 1860 it had around it a tolerable fence, the furnace was in rather a bad condition ; there was on it a dwelling-house, and storehouse, a barn, stabling and some out-houses. The fencing was destroyed during the war, and also the barn and stabling and out-houses, and the others have got to be in very bad repair. A good deal of railroading and iron castings attached to the furnace had been carried off ; and while the value of such property had enhanced between 1860 and 1865, on account of the condition of the property in the fall of 1865, it was, according to the testimony taken, altogether not much, if at all, enhanced in value. The location is a good point for business on the

Kanawha river; and just above this Wilcox land is lo-
cated, in less than a quarter of a mile from it, the little
village of Brownstown, containing some fifty or seventy-
five inhabitants.    The Chesapeake and Ohio railroad has
within a few years past, long since 1865, passed through
Brownstown, and in the estimation of some of the wit-
nesses has enhanced the value of property there and in
its immediate vicinity.    Others think it has not had that
effect.    In 1864, there was a considerable excitement in
that section as to oil lands; and it caused property gen-
erally in that neighborhood to rise in value rapidly; but
it lasted but a short time, and before the fall of 1865,
when this land was sold, this excitement had entirely
subsided, and the finding of oil in that section was re-
garded as a failure.    This property had not been worked
for salt purposes for more than fifteen years prior to
1865.    Some witnesses put a large estimate on this prop-
erty as salt property.    Others regarded it as of no value
in 1865 on that account.    Some valued too the coal land
attached to it at prices almost equal to the bottom land;
while others estimated the coal land to be worth not a
fifth part of the value of the farming land.    Some regard
this land on account of its proximity to Brownstown as
very valuable for building purposes, and suppose that a
considerable part of the bottom land could have been sold
in the fall of 1865 at higher prices for town lots.    Others
think there was no such demand for lots as would have
then enhanced to any appreciable extent the value of this
property.

Under such circumstances it is not remarkable that
witnesses should differ largely in their estimate of the value
of this property in 1865, especially as some of them were
obviously biased in their judgment.    Excluding the coal
and timber on this three hundred and twelve acre tract,
they differ in their estimate from $,4000.00 to $,8000.00.
There were more than twenty witnesses examined on
this point.    If I were to judge of the value of this prop-
erty in the fall of 1865, basing my judgment on the opin-

ions of these witnesses only, and weighing their testimony according to their apparent capacity of valuing this property, and making allowance for the evident bias of some of them, I should estimate this property, exclusive of the three hundred and twelve acres, as between $9,000.00 and $10,000.00. But on the other hand we have the testimony of the former executor, that he made diligent efforts for several years to sell this property, and could not get more than $4,600.00; that he tried twice once in 1859 and once in 1860, to sell it publicly, and at length succeeded at the last sale in having $4.000.00 offered for it. The sale then made, he says, was undoubtedly fair on his part, and he used every exertion to get the highest price. Neither the then purchaser, nor the purchaser in 1865 at $4.710.00, regarded at that time that he had made a very good bargain; but either of them would have been then willing to give up his purchase. It was also proved, that the second purchaser had spent in improving the property some $5,000.00.

1879
Special Term.
Bradford et al.
v.
McConihay et al.

The cause was heard on November 16, 1875, by the circuit court, which was of opinion that the plaintiffs were entitled to no relief, and dismissed the bill at their cost. From this decree they obtained an appeal and *supersedeas* from this court.

*W. A. Quarrier* and *Smith & Knight*, for appellants.

1. The three hundred and twelve acres do not pass by Hedrick's sale to McConihay. But if they do pass the sale is void and must be set aside, for the following reasons:

*a.* The three hundred and twelve acres were not appraised.

*b.* The sale was by public auction, yet the three hundred and twelve acres were never advertised to be sold.

*c.* The advertisement was so drawn as to conceal from bidders that it was offered for sale.

*d.* The land sold for a grossly inadequate price.

*e.* It was sold on terms different from, less liberal and harsher, than the will directs.

*f.* The administrator did not know that he was selling the three hundred and twelve acres.

*g.* The purchaser did not know that he was buying the three hundred and twelve acres.

2. The will as construed by the court, did not authorize the sale of the three hundred and twelve acres.

3. When a legacy is bequeathed, the payment of which is charged upon lands, and the lands are directed to be sold on long time, the legacy does not bear interest until after the sale, and until after the proceeds of sale are collected.

2 Johns. Ch. 628 ; *Fincke* v. *Fincke,* 53 N. Y. 528 ; 2 Brightley's N. Y. Dig. 2487 ; *Birdsall* v. *Hewlett* 1 Paige Ch. 32 ; *Van Bramer* v. *Hoffman,* 2 Johns. Cas. 200 ; *Lord* v. *Lord,* 2 Ch. Appeals 782 ; *Page's Appeal* 71 Pa. St. 402; *Kerr* v. *Rossler,* 62 Pa. St. 183 ; *Dewert's Appeal* 70 Pa. St. 403 ; *Dawes* v. *Swan,* 4 Mass. 208 ; *Page* v. *Millers,* 2 Duvall 168 ; *Drew* v. *Wakefield,* 54 Me. 291 ; *Gellman* v. *Gellman,* 16 Irish Ch. 561 ; *Mary A. Fish's estate* 1 Tucker's Surrogate 123 ; *Daniel Devlin's estate, Id.* 460 . *Heepburn* v. *Heepburn,* 2 Bradford 74 ; *Balantyne* v. *Turner,* 6 Jones's Eq. 224 ; *Turner* v. *Buck,* 18 Eng. L. & Eq. 361 ; *Bradner* v. *Faulkner,* 12 N. Y. 472 ; *Trippe* v. *Frazer,* 4 Harr. & J. 446 ; *Elvin* v. *Elvin,* 8 Ves. 554 ; *Dewert's Appeal,* 20 P. F. Smith, 403 ; *Kerr* v. *Bosler,* 12 P. F. Smith 183 ; *Miller* v. *Beverly,* 4 H. & M. 415 ; *Smith* v. *Moore* 25 Vt. 127 ; *Patt* v. *Patton,* 4 Rawle 119 ; *Keler* v. *Beelor,* 5 Mon. 578 ; *Roberts* v. *Mullen,* 5 Ind. 18 ; *Harvey* v. *Aston,* 1 Atk. 278 ; *Donavan* v. *Needham,* 9 Beav. 164 ; *Heorle* v. *Greenbank,* 3 Atk. 716 ; *Fish's estate* 19 Abbotts Pr. R. 209 ; *Gaskins* v. *Gaskins,* 17 Serg. & R. 390 ; *Steveson* v. *Axson,* 1 Bailey Ch. 274 ; *Laporte* v. *Bishop,* 11 Har. 152.

*James H. Ferguson* and *Mollohan & Fontaine,* for appellee, McConihay, cited the following authorities :

31 How. Pr. Rep. 172 ; Mem. of Reversed Cases Brightley's Dig. N. Y. Rep. ; *Finckey et al* v. *Finckey et al.,* 53

N. Y.; 8 Ves. 554; 6 Ves. 520; 2 Ves. Jr. 639 and note; 3 Cranch 180; 1 Greenl. Ev. §277 and note; 17 Wall. 175.

GREEN, PRESIDENT, delivered the opinion of the Court:

The first question presented by this record is : Did the will of Luke Wilcox, as interpreted by the circuit court of Kanawha county by the decree of November 29,1856, authorize the sale of this three hundred and twelve acre tract, or rather the saleof the coal and timber on this tract? This interest in this tract was unquestionably derived by the testator from the conveyance made to him by Madison Morris." The decree assigning this interest to him says : " It is to be held by him in severalty as for his own property which he claims by purchase from Madison Morris." The impressions of the witness, Dryden Donnally, are entitled to no consideration as against this clear and explicit declaration in the decree. The will says: "I further desire and hereby direct my excecutors that they shall sell the land and the appurtenances and improvements thereon, that was conveyed to me by Madison Morris by deed duly recorded in the clerk's office of the county of Kanawha ; and they shall also sell my interest (in the back lands below the left hand fork of Lens creek) in the estate of Leonard Morris, deceased, conveyed to me by James Hewitt by deed." It would seem impossible to doubt about the disposition made by the testator of all his lands acquired by deed from Madison Morris; wherever situated he obviously directs it to be sold. The only doubt that could be raised on this clause of the will was, what portion of the lands that were conveyed to the testator by James Hewitt were to be sold. The testator says such of the Hewitt lands as lie below the *left* hand fork of Lens creek. The doubt arising is, did he mean below the mouth of the left hand fork of Lens creek, or did he mean on the lower side of the left hand fork of Lens creek ?

Syllabus 1.

1879
Special Term.
Bradford *et al.*
v.
McConihay *et al.*

The court in construing this will by its decree uses this language: " And the court is further of opinion and doth decide that the executor of the said Luke Wilcox, deceased, is authorized and empowered by said last will and testament to sell the land, appurtenances and improvements conveyed to the said Luke Wilcox, deceased, by Madison Morris, *and also* the interest said Wilcox had in the estate of Leonard Morris, deceased, conveyed to him by James Hewitt, below Lens creek." There does not seem to me a possible question as to the meaning of this decree, so far as the lands conveyed to the testator by Madison Morris are concerned. The decree clearly declares that all these lands, wherever situated, are to be sold by the executor. While a certain part only of lands, conveyed to the testator by Hewitt, is to be so sold, that is, such part of them as is below Lens creek. The court thus interpreted the only doubtful words in the will, the words : " below the left hand fork of Lens creek," to mean on the lower side of the left hand fork of Lens creek, and not below the mouth of the left hand fork of Lens creek.

Nevertheless the appellant's counsel insists that this decree ought not to be so interpreted ; and that the words in the decree, " below Lens creek," apply as a description of the portion of the land conveyed by Madison Morris, which the executor was to sell, as well as to the lands conveyed by Hewitt. He urges, " that the punctuation and grammatical construction of this sentence in the decree construing this will shows clearly, that it was the intention of the court that the words ' below Lens creek' should refer equally to the Madison Morris lands, as well as the Hewitt lands. In other words, Lens creek was made the dividing line between the land devised to his daughter and the land devised to be sold. If this was not the case, there would be no necessity for the comma after Hewitt; there would be no break in the sentence; so far as the Hewitt lands are concerned it would be continuous ; but the sentence is broken up into

parts or members by the comma, and for the express pur- 1879 · Special ,Term.
pose of allowing the words ' below Lens creek ' to apply Bradford et al.
to the Madison Morris lands as well as to the Hewitt lands. v. McConihay et al.
The sentence is to be construed distributively."

The appellant's counsel at length insists that this is the
true meaning of this decree, and endeavors to show it
from the pleadings in this suit, which have been given
in the statement of the case.   I think he fails to show
that the pleadings would tend to such conclusion ; but I
need not follow him in this argument ; for the words of
this decree, in my judgment, are so clear that it needs no
enquiry to find out their meaning ; and their plain and
obvious meaning could not be controlled in this manner.
The words, *and also*, separating the portions of the de-
cree referring to the Madison Morris lands and the por-
tions of the decree referring to the Hewitt land, makes the
construction asked by appellant's counsel impossible.
With these words so inserted it is impossible to refer the
the concluding words " below Lens creek " to any but
the Hewitt lands.   The will too is equally explicit on
this point.   It too separates the direction to sell the
Madison Morris lands and the direction to sell the
Hewitt lands by the words " *and* they shall *also* sell."

But even if this decree could be so  interpreted as to
make the words "below Lens creek" refer also to the
Madison Morris land, still the interest in this three
hundred and twelve acre tract would be thereby included
as land to be sold ; for this three hundred and twelve
acre tract lies "below Lens creek" in the true meaning
of the words "Lens creek" as used in this decree.   The
map and evidence show that it lies between the two forks
of Lens creek "below the left hand fork" and "above
the right hand fork."   Now though the right hand fork
is somewhat larger than the left hand fork, I presume, it
being a mile or two longer, yet by this decree the left
hand fork  is clearly what is considered Lens creek, and
not the right hand fork, as the clause in the will the
court was construing says expressly, "below the left

hand fork of Len's creek." The only doubtful word in it was the word "below;" and as the court construed the word "below" to mean on the "lower side," it could only mean by the words "below Lens creek" on the lower or northern side of Lens creek, regarding the left hand fork as the true Lens creek after it was divided by forking. It is therefore clear, that by the interpretation put on this will by the circuit court the interest of the testator in this three hundred and twelve acres of land was liable to be sold by the executor, as a part of the property conveyed to him by Madison Morris; and as the residue of the fund arising from the sale of lands by the executor was to be paid to the four children of the testator, it follows that the three children of Mrs. Amelia W. Bradford had no interest in this three hundred and twelve acres of land, or in any of the lands in controversy in this cause; and the court did not err in its decree so far as it dismissed the bill as to these three infant children of Mrs. Bradford. But she being one of the children of the testator is entitled to an interest in the residue of the money arising from the sale of lands by the executor.

The next enquiry is: Did the administrator *de bonis non* with the will annexed, Charles Hedrick, in point of fact sell the testator's interest in this three hundred and twelve acre tract? It is obvious, that the sale made by the executor, Nicholas Fitzhugh, in 1860 did not include the coal and timber on this three hundred and twelve acre tract. It is true, as we have seen, he was authorized to sell this interest by the will; and when he had appraisers appointed by the county court of Kanawha county, " to appraise the land directed by the will of Luke Wilcox to be sold," he ought to have had this interest in this three hundred and twelve acres appraised by them. It is certain however that he did not have it appraised, for we have the report of the appraisers which was approved by the court and ordered to be recorded; and they are very clear and explicit. They valued only the fifty and one-fourth acres, as it is called, lying on

the river, which was the tract conveyed to the testator by
Madison Morris by metes and bounds, and the undivided
interest in the tract of five hundred and sixteen and one-
half acres immediately in rear of it and adjoining it, this
interest being said in the report to be forty and three-
fourths acres, an undivided thirteenth part of this five
hundred.and sixteen and one-half acre tract. Why the
executor did not have this interest in the three hundred
and twelve acre tract valued, we do not know. The
probable reason is, that he did not intend at that time to
sell it. And for the same reason he did not have the
Hewitt lands below Lens creek appraised, or it may be
they were forgotten by him. This appraisement was
made only four days before the public sale made by the
executor, and was no doubt an appraisement of the lands
he intended to sell and did actually sell. It seems to me
clear that he did not, when he advertised this property,
contemplate selling the interest in this three hundred
and twelve acres, though he did then contemplate selling
the interest in the Hewitt back lands below Lens creek,
but before the sale he abandoned the idea of selling any
of these Hewitt lands, and therefore probably did not
have them appraised. His advertisement cannot fairly
be construed to include this interest in this three hun-
dred and twelve acre tract.

The language of the advertisement was "The under-
signed will sell at public auction on Monday the 16th of
November, 1857, on the premises, the salt property late-
ly owned and occupied by Luke Wilcox, deceased, in
Kanawha county, Virginia, below Lens creek, being the
same property which was formerly conveyed by Madison
Morris to said Wilcox." Now it is true that this con-
veyance of Madison Morris to Luke Wilcox did convey
this interest in this three hundred and twelve acres, but
it had been assigned to him but a short time before his
death, and had never been, so far as the record shows,
occupied by him. It lies between the forks of Lens
creek, and is some four miles distant from the other

1879
Special Term.

Bradford et al.
v.
McConihay et al.

property, the premises on which the land was to be sold, and it never had been used in connection with it. It could not be considered a part of the salt property occupied by Luke Wilcox, and no purchaser from this advertisement could have supposed it was to be sold. The purchaser at the sale testifies, that he had no idea he was bidding for or bought any interest in this three hundred and twelve acres, four miles distant. And the executor testifies, that "the property sold by him was the Brownstown property." The two parcels of land which the appraisers only four days before the sale had appraised lie in the immediate neighborhood of Brownstown and adjoin each other, and they and only they are the "Brownstown property" sold by the executor.

Did the sale made by C. Hedrick, administrator *de bonis non* of Luke Wilcox, on October 3, 1865, include this interest in this three hundred and twelve acres, or was it to be confined to this Brownstown property, which had been previously sold by the executor, but which sale had never been perfected? He says in his answer that he was appointed *administrator de bonis non* with the will annexed of Luke Wilcox in 1863, "and this appointment was for the purpose chiefly, if not altogether, of getting a sale of the land, directed by the will to be sold to pay said legacy; that the estate of said Luke Wilcox, deceased, was then well nigh wound up and administered with the exception of the completion of the sale of the real estate." He probably therefore knew but little about the estate. He was one of the appraisers in 1857 of "the lands directed to be sold by the will of Luke Wilcox, deceased." The administrator had shown him but the two parcels of land near Brownstown adjoining each other, and known as the salt property, as the land to be sold, and he as one of the appraisers did then appraise this Brownstown property, and the report which he signed purports to be an appraisement of the lands directed to be sold by the will of Luke Wilcox. It is therefore highly probable, that when he sold on October 3, 1865, he did not even

know that he was authorized to sell an interest in three 1879
Special Term. hundred and twelve acres of land lying in the forks of Bradford et al. Lens creek, some four miles distant from the lands v.
McConihay et al. which had been shown him as the land to be sold, and which he had appraised. It seems to me this administrator in preparing his advertisement of the lands to be sold by him would naturally go to his report, which was on record, to describe the lands, and when we read his advertisement we cannot resist the conclusion that it was prepared from this report, or at least that he intended to advertise for sale the exact property that he had previously appraised, and which his predecessor had sold but had failed to complete the sale. The advertisement describes the property thus: "That valuable salt and coal property below Lens creek and near Brownstown, directed by said Wilcox's will to be sold. There are about forty acres of good Kanawha bottom, and sufficient coal to operate a furnace, a storehouse and other buildings." This description even more obviously than the advertisement of the executor would not include the coal and timber on a tract of land of three hundred and twelve acres between the forks of Lens creek, and distant four miles from Brownstown. This tract had never been used in connection with these salt works, and was so distant that probably it could not be, to any advantage. Why this piece of land any more than any of the Hewitt back lands, which he was authorized to sell, should be supposed to be included in this advertisement, I cannot see ; for it does not speak, as the advertisement of the executor had, of the land offered for sale being the Madison Morris land. Doubtless some of the Hewitt lands were much nearer to this salt property than this three hundred and twelve acre tract ; and they belonged to the testator and were authorized to be sold. If then we are permitted to interpret this advertisement as including this three hundred and twelve acre tract, surely it ought to be interpreted as including some of the Hewitt land lying much nearer Browstown and below Lens creek.

There is no evidence of what passed at the time of the sale, and in its absence we must assume that the land was sold which was advertised. It is true the administrator in his answer says : "he intended to sell all the lands and appurtenances with the improvements thereon conveyed by Madison Morris and wife to said Wilcox." Doubtless this is true ; but he does not pretend to say that he advertised, or announced at the time of the sale, that this was the land to be sold. He advertised only the "salt and coal property near Brownstown, on which was a storehouse and other buildings, sufficient coal to operate a furnace, and forty acres of good Kanawha bottom." He no doubt thought that this was all the "land and appurtenances and improvements conveyed by Madison Morris to Luke Wilcox ;" but his so thinking cannot make his sale extend to land so conveyed which was four miles distant, and in no manner appurtenant to this salt property. So too, the answer of the purchaser says in general terms : "That the interest in this three hundred and twelve acres was sold at the time and is a part of the purchase ;" but neither of these answers are sworn to, and the deposition of the administrator was never taken, and the purchaser in his deposition does not pretend in any way to define what was sold on the day of the sale. The bill specifically alleged : " That at the time of the sale made by Charles Hedrick, administrator, no mention was made of the said tract of three hundred and twelve acres," and this not being denied by either answer it must be regarded as true. Its truth is further shown by the proof that the purchaser was at first dissatisfied with his purchase, but was satisfied when he was informed by a lawyer two or three months afterwards that he had an interest, which he did not know of, or where it was, till so informed, and this was on Lens creek. The deed executed on the day of sale " conveys the land, appurtenances and improvements thereon that was conveyed to Luke Wilcox by deed duly recorded in the recorder's office of Kanawha county, which deed bears

date the 13th day of July, 1839, to which reference may
be had for a more particular description." As the prop-
erty conveyed is not specified in this deed of July 13,
1859, except a part of the salt property near Brownstown,
which is set out by metes and bounds, the parties doubt-
less thought that this description of the property
included only the property actually sold that day,
that is, this piece of land the boundaries of which
are given, and an interest in an adjoining tract
of land. But we have seen that in addition to these, it
conveys an interest in a tract of land of three hundred
and twelve acres about four miles distant from the
others. This mistake in this conveyance ought to have
been corrected by the circuit court in this suit.

The next enquiry is: Ought the court below to have
set aside this sale for the gross inadequacy of price? The
property sold for $4,710.00. The witnesses estimate
this property to be worth then about twice that amount;
but less confidence is to be placed in these estimates, be-
cause of the peculiar difficulties of estimating the then
value of this property. One witness estimates it to be
worth seven times as much as another, but these two es-
timates must be regarded as made by parties wanting in
sound judgment, or under undue bias; but even among
the witnesses, who were apparently unprejudiced and
equally competent, there is a very great difference in
their estimates, arising out of the intrinsic difficulty of
valuing the property. This alone apparently caused
some estimates to be double that of others. Under these
circumstances we cannot attach as much importance to
these estimates, as we would ordinarily attach to the esti-
mates of witnesses. As tending to show that the average
estimates of the witnesses of good judgment were too high,
we must remember that the former executor tried for
several years to sell this property and exerted himself in
good faith to get the highest price therefor, and never
had more than $4,600.00 offered for it, and that the party
who made this offer at a public sale did not, as his con-

1879
Special Term.
————
Bradford et al.
v.
McConihay et al.

Syllabus 3.

duct shows, think he had bought the property at less than it was fairly worth, and was not very anxious to get it at that price, though the property was then worth as much, or nearly as much, as it was at tue time of the second sale, and also that the purchaser at the second sale at the time was not anxious to keep the property at the price he had given, $4,710.00, but was willing to give it up, if he could do so without loss; and that there is no allegation or proof that at either of these sales there was any fraud or unfairness on the part of either the seller or buyer, but on the contrary that they were both perfectly fair sales. We must also in considering this question bear in mind that there are no infants interested in this sale; and that the party now seeking to set it aside has but a small interest in it, and that she did not institute this suit for nearly five years after the sale, and that in the meantime the purchaser has spent nearly or quite as much money in improving the property as he gave for it originally; and that these heavy expenditures were made without any protest by the parties interested in this sale, who could just as readily have instituted this suit promptly as after this lapse of time, and no excuse is offered for this delay.

There is no evidence or circumstance in this case from which it could be inferred, that in accepting the prices which they did for this property either the executor or afterwards the administrator were guilty of any bad faith or breach of the trust conferred on them, or that they did not act in good faith and according to their best judgment as to the interest of those to whom the proceeds of such sale were to be paid. The testator had been dead, when the last sale was made, more than eleven years. The legatee who was to be paid first out of the sale of this land had been paid no part of his legacy, and though a large discretion had been given the executor by the will as to the time of the sale and to the terms of credit on which this land might be sold extending, if the executors thought proper, to five years, it was still the duty of the

administrator with the will annexed to sell this land, 1879
Special Term.
Bradford et al.
v.
McConihay et al. even though he could not get' for it the appraised value, $8,500.00. Nor can I see that he acted in bad faith in selling for one-third cash and the balance in two equal instalments, at twelve and eighteen months, with interest from the day of sale. .He may well have thought that after the lapse of eleven years it would be unjust to the legatee to sell this land on a credit of five years, and had it been so sold, there is no sort of assurance that it would have brought a larger price, as the legatee was himself the purchaser. But even if he did err in judgment in fixing the terms of sale, it was a matter about which he had a right by the will to exercise his judgment, and there is no ground for supposing that in so doing he acted in bad faith. Several years had been spent by the executor in endeavoring to sell this land; $4,600.00 was the highest offer he had ever received, and the administrator cannot be charged with a delinquency of duty in accepting a bid of $4,710.00.

The courts generally regard, as the the value of a thing, the price it will bring. Value admits of no precise standard. This rule is especially applicable to public sales. When there are no ingredients in a case of suspicious character, and no peculiar relation of parties, mere inadequacy of price will not be considered by a court as any reason for setting aside a sale, unless where the inadequacy of price is so gross as of itself to prove fraud. But the case would have to be very strong to justify the court in holding a purchaser at a public auction, between whom and the vendor there had been no previous communication affecting the fairness of the sale, as chargeable with fraud, merely because the property has been knocked down to him at a small price. To set aside a sale for inadequacy of price under such circumstances the inequality must be so gross, that the mere stating of it must shock the conscience of a man of common sense and afford evidence of fraud. *Gwynne* v. *Heaton*, 1 Bro. C. C. 1; *Osgood* v. *Franklin*, 2 Johns. Ch. 23. And

courts have frequently refused to set aside sales and other contracts, where there was a great inadequacy of price, and where the circumstances surrounding the case were to some extent suspicious. See *Griffith* v. *Spratty*, 1 Cox 383 ; *Coppis* v. *Middleton*, 2 Madd. 409 ; *Naylor* v. *Winch*, 1 Sim. & St. 565 ; *Borrell* v. *Dana*, 2 Hare 460.

There being in the circumstances surrounding this case nothing to excite a suspicion of fraud or bad faith on the part of the administrator who made the sale, the inadequacy of the price is not such as to justify a conclusion that he, or the purchaser, acted in bad faith or fraudulently. And without this all the authorities hold that mere inadequacy of price will not be a ground for setting aside a sale or contract. In this case the only ground claimed for assailing this sale is the inadequacy of the·price.

Syllabus 4.

It only remains to consider, whether the legacy of $3,000.00 to John G. Bruce should bear interest from one year after the testator's death. This legacy is left him to be paid out of the fund arising from the sale of the real estate which the executors were to make. This sale was not made for more than eleven years after the testator's death ; and the appellants claim that it did not bear interest till after this sale was made. The language of the will is : "I give and bequeath to my friend, the Rev. John G. Bruce, and to his heirs forever $3,000.00 to be paid out of the fund arising from ·the sale of the real estate hereinbefore directed to be sold." And in the clause directing the sale the will says : " In making the sale of the real estate hereby directed, it is my wish and desire that my said executors shall act as they shall deem most to the advantage and interest of those concerned as to the proper time when said property shall be sold; and they are hereby authorized to sell the same on a credit of one, two, three, four and five years with interest, if by such credit, in their opinion, the interest of those concerned would thereby be best promoted. I desire that

1879
Special Term.

Bradford et al.
v.
McConihay et al.

when the legacies and bequests, as hereinafter provided to be paid out of this fund, shall have been paid and satisfied, I give and bequeath the rest and residue of the fund arising from the sale of said real estate to my four children, equally to be divided among them."

It is unquestionably true, that as a general rule a legacy payable at a future day does not bear interest except from the time it is payable; and the exceptions to this rule are cases which bear no resemblance to the case under our consideration. Most of the authorities referred to by the appellant sustain this position, and really decide nothing more than this, which has any bearing on the question under discussion. See *Ballantyne* v. *Turner*, 6 Jones Eq. 225; *Lupton* v. *Lupton*, 2 Johns. Ch. 228; *Van Bramer* v. *The Ex'r of Hoffman*, 2 Johns. Cases 200; *Kerr* v. *Bosler*, 62 Pa. St. (12 P. F. Smith) 183; Page's Appeal, 71 Pa. St. (21 P. F. Smith) 402; Dewert's Appeal, 70 Pa. St. (20 P. F. Smith) 403; *Dawes* v. *Swan et al.*, 4 Mass. 208; *Smith* v. *Moore*, 25 Vt. 127; *Magoffin's adm'r* v. *Patton et al.*, 4 Serg. & R. 119; *Heorle* v. *Greenbank*, 3 Atk. 716; *Stephenson* v. *Axon & Mitchell*, 1 Bailey 278. I have examined all these cases, because relied on in argument by appellant's counsel; but they only decide a proposition which is elementary, that as a general rule a legacy will not bear interest till it is payable. Many of them contain discussions as to what are the exceptions to this general rule; but it is obvious that these exceptions have no existence in circumstances such as are presented in this case; and the only question is: Was the legacy in this case by this will really payable at a future day? If it was, it can not bear interest except from that time. On the other hand, if it was not payable at a future time, then it will bear interest from twelve months after the testator's death. That proposition is as unquestionable as the other, and is admitted in many of the cases above referred to. If a testator simply bequeath a legacy to be paid to a legatee, and is silent as to when it is to be paid, all the

authorities agree that such a legacy will bear interest from a year after the testator's death ; for it is not made payable at a future time. Such a legacy is payable out of the personal estate generally, after the debts have been paid, and though it may take years to settle up the estate, dispose of the personal property, ascertain and pay the debts, and though the legatee may thus have no right to demand his legacy for years, yet when it is paid, it must be paid with interest from one year after the testator's death, unless by the will it was made payable at a future time. See *Sitwell* v. *Bernard*, 6 Ves. 520 ; *Entwistle* v. *Markland*, note to 6 Ves. 528; *Pearson* v. *Pearson*. 1 Sch. & Lef., wherein is cited the case of *Greening* v. *Baker*, where interest was allowed on a legacy from one year from the testator's death, though the fund did not come to be disposable for nearly forty years after the testator's death, and the legacy could not till then be paid.

Nor will the right of the legatee to demand this interest be changed by the fact that a particular fund, as the proceeds of the sale of land or of particular personal property, being directed by the will to be applied to the payment of the legacy, as is shown by the last cited case and others. The legacy is then called a demonstrative legacy ; and the legatee has a right to have the particular fund applied to the payment of his legacy, though their be no estate applicable to the payment of other legacies. While, if the fund should for any reason prove unavailing, he is still on the footing of other legatees, and may claim his legacy out of the general personal estate in common with other legatees who are general. See *Gallaher* v. *Gallaher*, 6 Watts 473 ; *Cogdell* v. *Widow*, 3 Desau. 372 ; *Wilcox* v. *Rhodes*, 2 Russ. 452 (8 Cond. E. Chy. 194) ; *Coleman* v. *Coleman*, 2 Ves. Jr. ; *Roberts* v. *Pocock*, 4 Ves. 150 ; *Fowler* v. *Willoughby*, 2 Sim. & St. 354, (1 Cond. E. Ch. 473) ; *Ashburn* v. *Maguir, and Cartwright* v. *Cartwrignt*, 2 Bro. C. C. 114. When the legacy is demonstative, that is, when the legacy is given with a demonstration of the particular fund as the source

or means of payment, it will not fail, even when the source out of which it is to be paid never had an existence. See *Gallaher* v. *Gallaher*, 6 Watts 473. It follows from these characteristics of a demonstrative legacy, that if it be not payable at a future time, like a general legacy it will bear interest from one year after the testator's death ; for the demonstration, or pointing out, of a particular fund out of which it is to be paid still leaves it on the footing of a general legacy, with the advantage over such general legacy of having that particular fund especially devoted to its payment to the exclusion of general legacies, if necessary.

The real difficulty is, to determine in some cases whether a legaey is a demonstrative legacy, that is a general legacy with a demonstration of the fund out of which for convenience it is to be paid, or a specific legacy. When the gift is so connected with the debt or security out of which it is to be paid that the gift of the legacy and of the debt or security are really the same, and when the intention is to give nothing more than the identical debt, or money due on the security, the legacy is not demonstrative, but is specific. In such cases of course the legatee cannot claim his legacies till the debt or security is realized. The courts however incline against construing a legacy as not demonstrative. One of the cases cited by appellant's counsel was of this description. In *Finche et al* v. *Finche et al*, 53 N. Y. 528, where a testator devised his real estate on trust to be sold and the proceeds divided among his grandchildren, and by a codicil he provided in case the proceeds do not amount to $30,000.00, there should be added to the proceeds out of his estate sufficient to make up that sum. This was regarded as a specific bequest to the extent of the value of the land, and a general bequest of enough to make up the $30,000.00; but this general legacy was not to be paid till the deficiency was known by a sale of the land ; and being only payable then, the legatees were entitled to receive the income of the land till the

sale, and not to recover interest on the whole $30,000.00 from the death of the testator. But most of the cases cited by him, where interest on legacies was not allowed till the fund out of which the legacies were to be paid was realized, were decided on the ground that from the wording of the will the legacies themselves were not payable till that time.

Thus in *Lord* v. *Lord*, 2 Ch. App. Cas. 782, a testatrix having a general power of appointment over property, which was the subject of a pending litigation, gave it by her will to J. L. upon trust : *"So soon* as the proceedings in law and equity should be terminated, and the same should come into his possession, that then he should assign certain stock ; secondly, to pay to each of her brothers and sisters £2,000." It was decided that the trust to pay the legacies did not arise, and consequently the legacies did not carry interest till the litigation ended and the property came into the hands of the trustee, which was more than eighteen years after the testator died. The counsel in that case on the one side contended, that by the construction of this will the legacies were payable immediately, though out of a fund not capable of realization immediately. They contended that it was a case where the payment was postponed only for the convenience of the estate. On the other side it was contended, that this was a gift out of a fund *when* realized. A gift *in future*, not a present legacy ; and as interest on a legacy payable *in future* only runs from the time it was payable, that interest could not be demanded till the fund was realized. And this last view was approved by the court, who approved the case of *Wood* v. *Penoyre*, 13 Ves. 325 ; but the court thought this case was distinguishable from it.

In that case the testator "gave £2,500 to be paid out of the money due on the Irish mortgage, *when the same shall be recovered.*" The court decided that the legacy bore interest from a year after the testator's death. Sir William Grant, the master of the rolls, says : "My first

impression of this case was that the words 'when the same shall be recovered' had the effect of postponing the time of payment, and consequently the right of interest until the mortgage debt, out of which the legatee was to be paid, should have been actually recovered and got in. But upon further consideration of the case, I am satisfied these words mean, and therefore ought to receive, a different construction.

"Whenever legacies are given out of outstanding securities, those legacies cannot be actually paid until the money due on such securities is actually got in; but by a rule which has been adopted for the sake of general convenience, this Court holds the personal estate to be reduced into possession within a year after the death of the testator. Upon that ground interest is payable upon legacies from that time, unless some other period is fixed by the will. Actual payment may in many instances be impracticable within that time; yet in legal contemplation the right to payment exists, and carries with it the right to interest until actual payment. In the case of *Entwistle* v. *Markland*, and *Sitwell* v. *Bernard*, 6 Ves. 520, it was determined that the reference by the testator to the time at which his personal estate should be got in, does not without the most plain and distinct indication of his intention, affect the legal presumption that the personal estate may be got in within a year from the testator's death." And again : "I cannot without neglecting the authority of these cases hold, that the mortgage, though not actually capable of being called in, is not to be understood as having been got in within the year. Constructive receipt is held equivalent to actual receipt for the purpose of the right to interest. See *Hambling* v. *Lyster*, 1 Amb. 401."

The cases of *Laporte* v. *Bishop*, 11 Harris (23 Pa. St.) 152; *Roberts et al* v. *Malin et al*, 5 Ind. 18; *Page &c.* v. *Miller's devisee*, 2 Duval 168 were cases in which there were contests about when legacies were payable and therefore from what time they bore interest : but neither they

nor any of the cases cited by the appellants' counsel, other than those I have commented on, really throw any light on the question we are considering.

Upon the authorities I have cited it seems to me clear that this legacy of $3,000.00 to John G. Bruce bears interest from one year after the testator's death. On the face of the will it is a present gift to him : "I bequeath to John G. Bruce $3,000.00 to be paid out of the land sales." It does not even say, to be paid when the proceeds of the sale of lands are realized; and if it had, it would perhaps under the authorities not have prevented the interest from running under the provisions of this will. As the will is worded it seems to me there can be no doubt. The fact that the testator for the convenience of his children, who were to get the balance of this land fund, authorized his executors to sell the land at whatever time they deemed best, and authorized them, if they chose, to give long credits upon it, it seems to me, on the authorities I have quoted, to have no weight in preventing the legacy from carrying interest from one year after the testator's death, as legacies generally do; for these provisions certainly did not necessarily prevent the executor from selling the lands, and realizing the funds, within the year. There was no legal impossibility in its being done, and for the purposes of charging interest on the legacy the law assumes it to be done. In many cases the testator from the situation of his estate· must know, that legacies cannot possibly be paid in a year from his death. Yet they are all legally due then and will bear interest from that time, unless the testator has expressly, or by clear indications, in his will shown that they were not to be paid until some later period.

Throughout the progress of this case it is assumed that the defendant, John McConihay, is the assignee of this legacy of $3,000.00 to John G. Bruce. But there is no proof that it ever was assigned to him, and does not still belong to Bruce. He, or his personal representative, must be made a party to this suit; and if it should turn

out that the legacy still belongs to Bruce, McConihay must be made to pay the purchase-money of the lands actually bought by him, before a deed is made to him for them.

I conclude therefore that the decree of the circuit court of November 16, 1875, must be reversed and annulled; the appellant, Amelia W. Bradford, must recover of the appellee, John McConihay, her costs about her appeal in this Court expended; and the cause must be remanded to the circuit court to be further proceeded with according to the principles laid down in this opinion and further according to the rules governing courts of equity; and that in so proceeding the bill should be dismissed as to the infant children of Amelia W. Bradford, they having no interest in the subject of controversy, but that it should be sustained as to the plaintiff, Amelia W. Bradford, as she has rights which should be protected and enforced in this suit, she being entitled to one-fourth of the surplus of the sale of lands made and to be made under the will of her father, Luke Wilcox, after the payment of the legacy to John G. Bruce; and she should be permitted and required under the penalty of a dismissal of her bill to amend the same in a reasonable time, but without prejudice to any other party to this suit or interested in the estate of Luke Wilcox, and make John G. Bruce or his personal representative, if he be dead, a party to this suit. It should set aside and avoid the deed made October 3, 1865, by C. Hedrick, administrator de bonis non with the will annexed of Luke Wilcox, to the defendant, John McConihay, as made so as to include by mistake of the parties more property than ought to have been conveyed to him; and upon his payment of the purchase-money due from him, if it has not already been paid, by its being proven that he is the assignee of the legacy to John G. Bruce, the court should have a deed executed to him conveying the land actually purchased by him, that is, the land included in the appraisement made by C. Hedrick, John D. Lewis and A. P. Sennett,

1879
Special Term.

Bradford et al.
v.
McConihay et al.

sworn to by them November 12, 1857, and none other, which sale the court should uphold as fair and binding on the parties ; and the court under its supervision should have sold the residue of the real estate, directed by the will of Luke Wilcox to be sold, that is to say, the coal and timber on the three hundred and twelve acres of land in the bill named, and any other real estate conveyed by Madison Morris to Luke Wilcox, wherever situated, which has not already been sold, and any real estate belonging to the estate of Leonard Morris, deceased, which was conveyed to Luke Wilcox by James Hewitt, and which lies on the lower or northern side of Lens creek or the left hand fork thereof; and out of the proceeds of such sales, and of the sale already made, the court should have paid the whole, or such remainder of the legacy bequeathed to John G. Bruce as has not already been paid, with interest thereon from one year after the death of the testator, and distribute the residue equally among the four children of Luke Wilcox, or their assignees, or the persons entitled to their shares respectively ; and take such other steps as equity and justice may require.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED.    CAUSE REMANDED.